## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| MARK MCCOOL, SHAWN MACDONALD, and WARREN HARLAN individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>ARDENT HEALTH SERVICES, LLC BOARD OF DIRECTORS OF ARDENT HEALTH SERVICES, DAVID T. VANDEWATER, ARDENT HEALTH SERVICES BENEFITS PLAN ADMINISTRATION COMMITTEE, NEIL HEMPHILL, BRIAN WALTON, JAMES GRIMES, ASHLEY CRABTREE, STEVE HINKLE, and JOHN DOES 1-30.<br>     Defendants. | **CIVIL ACTION NO.**:<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiffs Mark McCool, Shawn MacDonald, and Warren Harlan ("Plaintiffs"), by and through their attorneys, on behalf of the Ardent Health Services Retirement Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

### I.  INTRODUCTION

1.  This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Ardent Health Services Management Company, Inc., a.k.a.

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Ardent Health Services LLC ("Ardent" or the "Company"), the Board of Directors of Ardent ("Board") and its current and former members, and the Ardent Health Services Benefits Plan Administration Committee ("Committee") and its members for breaches of their fiduciary duties.

2.      Defined contribution retirement plans, like the Ardent Plan, confer tax benefits on participating employees to incentivize saving for retirement.  As of the end of 2015, Americans had approximately $6.7 trillion in assets invested in defined contribution plans.  *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $24.0 Trillion in Fourth Quarter 2015* (Mar. 24, 2016), available at https://www.ici.org/research/stats/retirement/ret_15_q4; PLAN SPONSOR, *2015 Recordkeeping Survey* (June 2015), available at http://www.plansponsor.com/2015-Recordkeeping-Survey/.

3.      In a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015).  Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the participants.

4.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  29 U.S.C. § 1104(a)(1).  These twin fiduciary duties are "the highest known to the law." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002), *cert. denied*, 527 U.S. 1168 (2003).  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. *Glass*

*Dimensions, Inc. v. State Street Bank & Trust Co.*, 931 F. Supp. 2d 296, 305 (D. Mass. 2013) and *See,* 29 U.S.C. § 1104(a)(1)(B).

5.     The Plan has nearly $1 billion dollars in assets that are entrusted to the care of the Plan's fiduciaries.  The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

6.     Plaintiffs allege that during the putative Class Period (December 24, 2013 to the present) Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost;  and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

7.     To make matters worse, Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan, and failed to consider collective trusts, commingled accounts, or separate accounts as alternatives to the mutual funds in the Plan, despite their lower fees.

8.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of

29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

9. Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.  JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

11. This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

12. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.  PARTIES

### Plaintiffs

13. Plaintiff Mark McCool ("McCool") resides in Glenpool, Oklahoma. During his employment, Plaintiff McCool participated in the Plan investing in the options offered by the Plan.

Case 3:19-cv-01158   Document 1   Filed 12/24/19   Page 4 of 54 PageID #: 4

14.     Plaintiff Shawn MacDonald ("MacDonald") resides in Albuquerque, New Mexico. During his employment, Plaintiff MacDonald participated in the Plan investing in the options offered by the Plan.

15.     Plaintiff Warren Harlan ("Harlan") resides in Spring Hill, Tennessee.  During his employment, Plaintiff Harlan participated in the Plan investing in the options offered by the Plan.

16.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

17.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of separate accounts and collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.  Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  Having never managed a jumbo 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.  Plaintiffs did not and could not review

5

the Committee meeting minutes or other evidence of Defendants' fiduciary decision making, or the lack thereof.[2]  For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

### Defendants

### Company Defendant

18.     Defendant Ardent was founded in 2001.  Among other things, Ardent provides general medical and surgical hospital services.[3]  The Company includes 30 hospitals and 25,000 employees and is located in Nashville, Tennessee.  Ardent is the Plan sponsor.  *See* Investment Policy Statement (2018) ("IPS") at 3; *see also* 2018 Form 5500 at 1.

19.     The Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) for several reasons.  First, it is a named fiduciary under the Plan.  Second, it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.  Third, it was responsible for monitoring other fiduciaries.

20.     As evidence of the Company's fiduciary status, the IPS states that "[t]he Plan Sponsor is the named fiduciary under the Plan with respect to the investment of Plan assets to the extent described herein, and is responsible for appointing the members of the [Ardent Health Services Benefits Plan Administration ]Committee." IPS at 4.

21.     Additionally, the IPS states that "the Plan Sponsor, in conjunction with an investment consultant (the "Investment Consultant"), will endeavor to provide an appropriate

---

[2] Several weeks prior to filing the instant lawsuit, Plaintiffs requested that the Plan administrator produce meeting minutes of the relevant Plan investment committee(s), but their request was denied.

[3] *See https://www.bloomberg.com/profile/company/0436906D:US*

6

range of investment options…."  IPS at 3.  Ardent "remains responsible for the overall selection and monitoring of all investment options."  *Id.*

22.　　The IPS also acknowledges that the Company as Plan sponsor must administer the Plan "for the exclusive benefit of its employees and their designated beneficiaries." *Id.*

23.　　With regard to Ardent's role in appointing Plan fiduciaries, the IPS states Ardent "appointed the Ardent Health Services Benefits Plan Administration Committee [] to fulfill the Plan Sponsor's fiduciary duties in regards to Plan investments." IPS at 3.

24.　　Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

### Board Defendants

25.　　The Board is defined as "the governing body of the Sponsoring Employer [Ardent] or a committee of the governing body, authorized by, and acting on behalf of, the governing body." *See* Basic Plan Document No.01 (dated 1/12/15) ("Plan Doc.") at 3.

26.　　Accordingly, the Company acted through the Board Defendants to perform the Company's Plan-related fiduciary functions.  Among some of these functions was the power to appoint the Committee members.  As noted above, under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

27.　　The Board also exercised discretion to authorize Ardent to contribute annual profit sharing amounts to the Plan participants.  2018 Form 5500 at p. 32 of 42.

28.　　During the Class Period, David T. Vandewater served on the Board of Ardent.  Mr. Vandewater joined Ardent as chairman of Behavioral Healthcare Corporation, Ardent's predecessor company, in 2001.  Later that year, he was appointed president and chief executive officer.

7

29.     Mr. Vandewater, and each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period, because each exercised discretionary authority to appoint and monitor Plan fiduciaries who had control over Plan management and/or authority or control over management or disposition of Plan assets.

30.     Defendant Vandewater, together with any unnamed members of the Board of Directors for Ardent during the Class Period are collectively referred to herein as the "Board Defendants."

### Committee Defendants

31.     "The members of the Committee are Plan fiduciaries, supervise the investment of the assets of the Plan, and make decisions concerning investment options available under the Plan." IPS at 4.

32.     The Committee has taken upon itself responsibility for "the oversight of the investment portion of the Plan." *Id.* Among other things, the Committee is responsible for the following Plan functions:

- Selecting the trustee(s);

- Hiring the recordkeeper and/or Investment Consultant(s)

- Selecting the investment options, including the investment(s) for default when a participant of [sic] beneficiary fails to provide investment direction;

- Periodically evaluating the Plan's investment performance and considering investment option changes;

- Periodically monitoring the performance and fees charged by service providers (and any other Plan fees); and

8

- Reviewing reports on the Plan's investment performance at least quarterly

IPS at 4.

33. Additionally, the Plan offers "a self-directed brokerage option" which the Committee evaluates in the "areas of costs, service capabilities, and participant utilization." *Id.* at 5.

34. Lastly, the "Committee has the authority to recommend the removal or replacement of an investment fund if, in the opinion of the Committee, the investment option does not, or is not expected to, meet the specified criteria or is no longer suited to the Plan and its participants." *Id*. at 7.

35. During the Class Period the following Ardent employees served as members of the Committee:

- Neil Hemphill ("Hemphill")
- Brian Walton ("Walton") – Senior Vice President of Ardent, Financial Operations
- James Grimes ("Grimes") – Senior Vice President of Finance and Chief Accounting Officer
- Ashley Crabtree ("Crabtree") – Senior Vice President and Treasurer
- Steve Hinkle ("Hinkle") – Vice President of Compliance and Litigation

36. The Committee and each of its members, including Hemphill, Walton, Grimes, Crabtree, and Hinkle, were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

9

37.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

### Additional John Doe Defendants

38.     To the extent that there are additional officers and employees of Ardent who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Ardent officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

### Non-Defendant Fiduciaries

### Sageview Advisory Group

39.     Upon information and belief, Sageview Advisory Group, LLC ("Sageview") is the investment consultant hired to assist the Committee and Ardent in their role in selecting and monitoring the Plan's investment options. Sageview is listed on the 2018 Form 5500 as a consultant and was paid $75,000 in compensation by the Plan in 2018. *See* 2018 Form 5500 at 1.

40.     The firm describes itself as "an independent Registered Investment Advisor with over 130 employees located in 25 offices nationwide." https://www.sageviewadvisory.com/ Further, the firm states that it "provides unbiased retirement plan and wealth management consulting services to clients throughout the U.S." *Id*.

41.     Under the IPS, the "Investment Consultant is charged with the responsibility of advising the Committee on investment policy, advising on the selection of investment options,

10

providing performance analysis and monitoring services, and educating the Committee on economic and investment trends that may impact the performance of the selected and available investment options." IPS 4. Further, "[t]he Investment Consultant, along with the Committee, shall be responsible for the Plan-level investment selection process." *Id.* at 4.

42. Although Sageview is a relevant party and likely to have information relevant to this action, it is not named as a defendant given that Ardent "remains responsible for the overall selection and monitoring of all investment options." IPS at 3. Plaintiffs reserve the right to name Sageview as a defendant in the future if deemed necessary.

## IV. THE PLAN

43. "The purpose of the Plan is to provide retirement income benefits to Employees" of Ardent and "to provide such Employees with an opportunity to accumulate retirement savings on a tax-deferred basis." Plan Doc. at 1.

44. The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

45. Ardent initially established the Plan on October 1, 1993. *See* Adoption Agreement for the Transamerica Retirement Solutions, LLC Volume Submitter 401(k) Profit Sharing Plan

("Adoption Agreement")[4] at 2.  The Plan has been amended and restated over the years with the last amendment and restatement occurring on September 1, 2017.  *Id.*

*Eligibility*

46.     To participate in the Plan, a participant must be at least age 21 and have worked at the Company for at least three months.  Adoption Agreement at 3-4; *see also* 2018 Form 5500 at p. 31 of 42.

*Contributions*

47.     As of September 1, 2017, participants may elect to contribute up to 85% of their compensation.  *Id.* at 9; 56.  Between January 1, 2017 through August 31, 2017, participants could contribute up to 100% of their compensation.  *Id.* at 56.

48.     Participant contributions are "excludible by the participants for federal income tax purposes under Section 401(k) of the Internal Revenue Code."  2018 Form 5500 at p. 31 of 42.

49.     Further, participants may also make their contributions on an after tax basis in the form of Roth contributions.  *Id.*  The Plan also accepts rollover contributions after a participant meets the minimum requirements for Plan participation.  *Id.*  Generally, this means "employees must make a minimum contribution of 1% of compensation."  *Id.*

50.     Ardent "makes safe harbor nonelective matching contributions equal to 100% of each participant's contributions up to 3% of compensation, and 50% of each participant's contributions exceeding 3% up to 5% of compensation."  *Id.* at 32 of 42.

51.     Additionally, Ardent "may make a discretionary nonelective contribution(s) each Plan Year."  *Id.* at 24.  If the Company decides to make such a contribution, it will be allocated in

---

[4] *See* Plan Doc at cover page (noting that "This Basic Plan Document is to be used in conjunction with the Transamerica Retirement Solutions, LLC Volume Submitter 401(k) Profit Sharing Plan Adoption Agreement.")

Case 3:19-cv-01158   Document 1   Filed 12/24/19   Page 12 of 54 PageID #: 12

"the same ratio that each Participant's compensation bears to the total compensation of all Participants." *Id*. at 25.

### Vesting

52.     "Participants are always 100% fully vested in their Employee Contributions (including Elective Deferrals, Catch-Up contributions, Roth Elective Deferrals, Voluntary After-Tax contributions, and Required After-Tax contributions). Adoption Agreement at 38.

53.     For the part of participants' account balances attributable to Ardent's contributions, participants are immediately fully vested in matching contributions. 2018 Form 5500 at 32 of 42. Vesting in the discretionary profit sharing contributions is based on years of continuous service. *Id.*

### The Plan's Investments

54.     Several funds were available to Plan participants for investment each year during the putative Class Period, including several T. Rowe Price Retirement Advisor target date funds. For 2018, the Plan offered 30 investment options, including 28 mutual funds worth $681,124,398. *See* 2018 Form 5500 at p. 40 of 42.

55.     The Plan's assets under management for all funds during 2018 ranged from $563,267,209 as of January 1, 2018 to $777,862,319 as of December 31, 2018. *See* 2018 Summary Annual Report for Ardent Health Services Retirement Savings Plan ("2018 Summary Annual Report").

## V. CLASS ACTION ALLEGATIONS

56. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between December 24, 2013 and the present (the "Class Period").

57. The members of the Class are so numerous that joinder of all members is impractical. "A total of 28074 persons were participants in or beneficiaries of the plan at the end of the plan year [2018]." 2018 Summary Annual Report.

58. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

59. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

> A. Whether Defendants are fiduciaries of the Plan;
>
> B. Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

C.    Whether the Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.    The proper form of equitable and injunctive relief; and

E.    The proper measure of monetary relief.

60.    Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

61.    This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

62.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VI. DEFENDANTS' FIDUCIARY STATUS
## AND OVERVIEW OF FIDUCIARY DUTIES

63.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

64.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

65.     As described in the Parties section above, Defendants were fiduciaries of the Plan because:

(a)     they were so named; and/or

(b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

(d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

16

66.     As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These twin duties are referred to as the duties of loyalty and prudence, and are "the highest known to the law." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 426 (6th Cir. 2002), *cert. denied*, 527 U.S. 1168 (2003).

67.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quotation marks and citations omitted). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

68.     In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries, and set aside the consideration of third persons.

69.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct.

2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds . . . could theoretically, in combination, create a prudent portfolio." *In re Amer. Int'l Grp., Inc. ERISA Litig. II*, No. 08-cv-5722, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423-24 (4th Cir. 2007)).

70.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") further provides that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

71.     During the Class Period, Defendants did not act in the best interests of the Plan participants. Investment fund options chosen for a plan should not favor the fund provider over the plan's participants. Yet, here, to the detriment of the Plan and their participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plan.

72.    Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options.  Additionally, Defendants failed to leverage the size of the Plan to negotiate lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period.

73.    As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries, and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## VII.    SPECIFIC ALLEGATIONS

### A.    Improper Management of an Employee Retirement Plan Can Cost the Plan's Participants Millions in Savings

74.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA") § 7.

75.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1190 (9th Cir. Dec. 30, 2016) (*en banc*) (quoting Restatement (Third) of Trust § 90, cmt. b).  *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/ebsa/publications/401k_employee.html (last visited August 18, 2017) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses

19

paid by your plan."). As the Ninth Circuit described, additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1190 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

76.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. *See* Brandon, Emily, "The Top 10 Sources of Retirement Income," available at http://money.usnews.com/money/blogs/planning-to-retire/2014/05/13/the-top-10-sources-of-retirement-income ("The 401(k) is the major source people think they are going to rely on."). Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

77.     In fact, the Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "*A Look at 401(k) Plan Fees*," *supra*.

78.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, (July

20

2016), at 4. "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 5.

79.     The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from companies like Morningstar, which sorts mutual funds of all kinds into categories "based on the underlying securities in each portfolio…We place funds in a given category based on their portfolio statistics and compositions over the past three years." *See* http://www.morningstar.com/InvGlossary/morningstar_category.aspx.[6]

80.     On average, there are lower expense ratios for 401(k) participants than those for other investors. *See The Economics of Providing 401(k) Plans*, at 11. ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, resulting in great competition among mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans, especially the largest ones with over a $1 billion in assets managed, lead to economies of scale and special pricing within mutual funds. *See id* at 10.

81.     This has led to falling mutual fund expense ratios for 401(k) plan participants since 2000. In fact, these expense ratios fell 31 percent from 2000 to 2015 for equity funds, 25 percent for hybrid funds, and 38 percent for bond funds. *See id*. at 1.

---

[6] As described by Morningstar, these categories "were introduced in 1996 to help investors make meaningful comparisons between mutual funds. Morningstar found that the investment objective listed in a fund's prospectus often did not adequately explain how the fund actually invested…[we] solved this problem by breaking portfolios into peer groups based on their holdings. The categories help investors identify the top performing funds, assess potential risk, and build well-diversified portfolios." *See The Morningstar Category Classifications* (June 30, 2016), at 7. These categories are assigned to mutual funds, variable annuities, and separate accounts. *Id.*

82.     The most recent comprehensive average mutual fund expense data for plans of different sizes is from 2012, and industry analysts have recognized a marked trend toward lower fees in 401(k)s over the past four years.  *See* Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL STREET JOURNAL (May 15, 2016), available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601 (noting precipitous drop in overall 401(k) fees from 2012 to 2014).

83.     The following figure published by the ICI best illustrates that 401(k) plans on average pay far lower fees than regular industry investors, even as expense ratios for all investors continued to drop for the past several years.[7]

**FIGURE 7**

**Average Total Mutual Fund Expense Ratios**
*Percent, 2013–2015*

| | 2013 | | 2014 | | 2015 | |
|---|---|---|---|---|---|---|
| | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] | Industry[1] | 401(k)[2] |
| **Equity funds** | **0.74** | **0.58** | **0.70** | **0.54** | **0.68** | **0.53** |
| Domestic | 0.67 | 0.54 | 0.64 | 0.50 | 0.62 | 0.51 |
| World | 0.90 | 0.73 | 0.86 | 0.67 | 0.82 | 0.62 |
| **Hybrid funds** | **0.80** | **0.57** | **0.78** | **0.55** | **0.77** | **0.54** |
| **Bond funds** | **0.61** | **0.48** | **0.57** | **0.43** | **0.54** | **0.38** |
| High-yield and world | 0.83 | 0.79 | 0.78 | 0.65 | 0.74 | 0.56 |
| Other | 0.51 | 0.44 | 0.48 | 0.40 | 0.46 | 0.35 |
| **Money market funds** | **0.17** | **0.19** | **0.13** | **0.16** | **0.14** | **0.16** |

[1] The industry average expense ratio is measured as an asset-weighted average.
[2] The 401(k) average expense ratio is measured as a 401(k) asset-weighted average.
Note: Data exclude mutual funds available as investment choices in variable annuities and tax-exempt mutual funds.
Sources: Investment Company Institute and Lipper

---

[7] This chart does not account for the strategy of a mutual fund, which may be to mirror an index, a so-called passive management strategy, or may attempt to "beat the market" with more aggressive investment strategies via active management.  Active management funds tend to have significantly higher expense ratios compared to passively managed funds because they require a higher degree of research and monitoring than funds which merely attempt to replicate a particular segment of the market.

22

*Id.* at 12.

84.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

1. **Passively Managed Funds Cost Less Than Actively Managed Funds**

85.     ERISA is derived from trust law. *Tibble v. Edison, Int'l*, 135 S. Ct. 1823, 1828. (2015). Accordingly, the Supreme Court has stated that where ERISA is silent, courts should seek guidance from trust law. *Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996). One such area is the selection of appropriate funds for a plan. Trust law states it depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case." Restatement (Third) of Trusts § 100 cmt. b(1). To determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more suitable common trust funds, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." *Id.*

86.     In this action, each investment option within the Plan charged certain fees, to be paid by deductions from the pool of assets under management. For passively managed funds, which are designed to mimic a market index such as Standard & Poor's 500, securities were purchased to match the mix of companies within the index. Because they are simply a mirror of an index, these funds offer both diversity of investment and comparatively low fees.

87.     By contrast, actively managed funds, which have a mix of securities selected in the belief they will beat the market, have higher fees, to account for the work of the investment managers of such funds and their associates.

23

88.     While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.  *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market?  Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed funds:  Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

89.     Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

## 2.  Institutional Share Classes Cost Less Than Investor Share Classes

90.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power.  There is

no difference between share classes other than cost—the funds hold identical investments and have the same manager.

91.     Large defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.  Even when a plan does not yet meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan adding the fund in question to the plan as a designated investment alternative.  Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

92.     One recent article written by the head of a fiduciary consulting firm described the failure to investigate the availability of and subsequently utilize the lowest-cost share class as an "egregious fiduciary breach[]" that is responsible for "[w]asting plan assets" in a manner that is "clearly imprudent." Blaine Aikin (exec. chairman of fi360 Inc.), *Recent Class-Action Surge Ups the Ante for 401(k) Advice*, INVESTMENTNEWS (Jan. 21, 2016), available at http://www.investmentnews.com/article/20160121/BLOG09/160129985/recent-class-action-surge-ups-the-ante-for-401-k-advice.  Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share

25

classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, slip op. at 13 (C.D. Cal. Aug. 16, 2017).

93.     As one commentator put it, "The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances.  In other words, the 'prevailing circumstances'—such as the size of the plan—are a part of a prudent decision-making process.   The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach." Fred Reish, *Just Out of Reish: Classifying Mutual Funds*, PLAN SPONSOR (Jan. 2011), available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

94.     This claim is not about the use of "retail mutual funds" versus the use of "institutional mutual funds."   Retail mutual funds are perfectly acceptable and prudent choices under certain circumstances.   In some instances, a mutual fund company may only offer retail mutual funds.   Or, in other instances, the mutual fund company might restrict institutional share classes in such a manner that would make it impossible to utilize the mutual funds.   This claim is instead about utilizing the lowest-cost class of shares that is available to the Plan.

### 3.   Collective Trusts And Separate Accounts Cost Less Than Their Virtually Identical Mutual Fund Counterparts

95.     The investment options offered within the Plan were mostly pooled investment products known as mutual funds.  Throughout the Class Period, the investment options available to participants were almost exclusively mutual funds.

96.     Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees.  Some of the best investment vehicles for these goals are collective trusts, which pool plan

26

participants' investments further and provide lower fee alternatives to even institutional and 401(k) plan specific shares of mutual funds. As noted *supra*, trust law specifically identifies "one or more suitable common trust funds" as a comparator to determine whether a trust is invested in suitable investments. Restatement (Third) of Trusts § 100 cmt. b(1).

97. Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash. Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise nor issue formal prospectuses. As a result, their costs are much lower, with less or no administrative costs, and less or no marketing or advertising costs. *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.

98. Due to their potential to reduce overall plan costs, collective trusts are becoming increasingly popular; *Use of CITs in DC Plans Booming* (discussing data showing that among both mid-size and large defined contribution plans, significantly more assets are held in collective trusts than in mutual funds).[8] Indeed, as of 2012, among plans over $1 billion in size, more assets were

---

[8] The criticisms that have been launched against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts are able to track the daily performance of their investments online. *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, EMPLOYEE BENEFIT NEWS (Apr. 14, 2016), available at http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (hereinafter CITs Gaining Ground). Many if not most mutual fund strategies are available in collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund. *Use of CITs in DC Plans Booming; CITs Gaining Ground*. And because collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, the Plan has the same level of protection that the Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act. Further, collective trusts are still subject to state and federal banking regulations that provide comparable protections. American Bankers Association, ABA Primer on Bank Collective Funds, June 2015,

27

held in collective trusts than in mutual funds. *See* Investment Company Institute, *A Close Look at 401(k) Plans*, at 21, 23 (Dec. 2014), available at https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf.

99.     Thus, a prudent fiduciary managing a plan with close to a $1 billion in assets will give serious consideration to the use of separate accounts or collective trusts, and in the majority of cases, will opt to move out of mutual funds.

100.     Separate accounts are another type of investment vehicle similar to collective trusts, which retain their ability to assemble a mix of stocks, bonds, real property and cash, and their lower administrative costs.

101.     Separate accounts are widely available to large plans such as the Plan, and offer a number of advantages over mutual funds, including the ability to negotiate fees. Costs within separate accounts are typically much lower than even the lowest-cost share class of a particular mutual fund. By using separate accounts, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds." U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), available at https://www.dol.gov/ebsa/pdf/401kRept.pdf (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds").

---

at 1, available at https://www.aba.com/Tools/Function/Trust/Documents/
ABA%20Primer%20on%20Bank%20Collective%20Investment%20Funds.pdf.

28

**B.    Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds**

102.    The Supreme Court recently reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble v. Edison, Int'l*, 135 S. Ct. 1823 (2015).  In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828.  In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act, treatises, and seminal decisions confirming the duty.

103.    The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets. . . ."  135 S. Ct. at 1828 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments."  *Id.* § 2 comment.

104.    Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs."  Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").  Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings.  *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

29

105.    As the amount of assets under management approaches and exceeds $1 billion, economies of scale dictate that very low cost investment options will be available to such plans. When large plans, particularly those with close to $1 billion in assets like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

106.    The Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their high costs.  Indeed, in 2013 the Plan only had 4 passively managed funds.  Between 2014 and 2017 it only had 5 passively managed funds.  Otherwise all investment options have been actively managed.

107.    During the Class Period, the Plan lost millions of dollars in offering investment options that had similar or identical characteristics to other lower-priced investment options.

108.    Upon information and belief, the majority of funds in the Plan stayed the same during the Class Period.  Taking 2017 as an example year, 21 out of 28 funds in the Plan – a staggering 75% of funds, were much more expensive than comparable funds found in similarly-sized plans (plans having $500m to $1b in assets).  The expense ratios for funds in the Plan were up to *40%* above the median expense ratios in the same category.  *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2015* at 69 (March 2018) (hereafter, "ICI Study").[9]

---

[9] *See* *https://www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf*

109. The comparison of the 75% of the funds described above are indicated below:

| Fund | ER[10] | Category | ICI Median Fee[11] |
|---|---|---|---|
| T. Rowe Price Retirement 2030 Advisor | 0.92 % | Target Date | 0.65% |
| T. Rowe Price Retirement 2025 Advisor | 0.89 % | Target Date | 0.65% |
| T. Rowe Price Retirement 2020 Advisor | 0.86 % | Target Date | 0.65% |
| T. Rowe Price Retirement 2035 Advisor | 0.95 % | Target Date | 0.65% |
| T. Rowe Price Retirement 2040 Advisor | 0.97 % | Target Date | 0.65% |
| Putnam Equity Income R6 | 0.55 % | Domestic Equity | 0.52% |
| T. Rowe Price Retirement 2045 Advisor | 0.97 % | Target Date | 0.65% |
| T. Rowe Price New America Growth I | 0.66 % | Domestic Equity | 0.52% |
| American Funds Europacific Growth R6 | 0.49 % | Int'l Equity | 0.53% |
| T. Rowe Price Retirement 2050 Advisor | 0.97 % | Target Date | 0.65% |
| T. Rowe Price Retirement 2015 Advisor | 0.82 % | Target Date | 0.65% |

---

[10] Because the funds in the Plan remained relatively unchanged from the beginning of the Class Period to the present, the listed expense figures are taken from the most recent summary prospectuses published in 2019.

[11] This median fee is taken from plans with between $500m and $1b.

Case 3:19-cv-01158   Document 1   Filed 12/24/19   Page 31 of 54 PageID #: 31

| | | | |
|---|---|---|---|
| Hartford MidCap HLS IA | 0.69 % | Domestic Equity | 0.52% |
| T. Rowe Price Target 2055 Advisor | 0.97 % | Target Date | 0.65% |
| Nuveen Small Cap Value R6 | 0.78 % | Domestic Equity | 0.52% |
| Carillon Eagle Small Cap Growth R6 | 0.65 % | Domestic Equity | 0.52% |
| PGIM QMA Mid-Cap Value Z | 0.89 % | Domestic Equity | 0.52% |
| T. Rowe Price Retirement 2005 Advisor | 0.79 % | Target Date | 0.65% |
| T. Rowe Price Retirement 2010 Advisor | 0.79 % | Target Date | 0.65% |
| Templeton Global Bond R6 | 0.57 % | Int'l Bond | 0.64% |
| JHancock Alternative Asset Allc R6 | 1.30 % | Other | 0.78% |
| Artisan Mid Cap Institutional | 0.96 % | Domestic Equity | 0.52% |

110.    The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period. That is because the ICI study was conducted in 2015 when expense ratios would have been higher than today given the downward trend of expense ratios the last few years. Accordingly, the median expense ratios in 2019 utilized by similar plans would be lower than indicated above, demonstrating a greater disparity between the 2019 expense ratios utilized in the above chart and the median expense ratios.

111.    Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan funds because many prudent alternative funds were available that offered lower expenses than the median.

112.    As demonstrated by the charts below, in several instances, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class and/or collective trusts available for the Plan's mutual funds, which are identical to the mutual funds in the Plan in every way except for their lower cost.

113.    From 2013 to 2014, the lowest share classes T.Rowe Price offered for its target date funds were the Investor shares.  The Investor share classes were less expensive than the identical Advisor class offered in the Plan.  Additionally, the remaining funds in the Plan had identical lower share counterparts that were never selected by the Plan's fiduciaries.   The aforementioned allegations are depicted in the chart below using 2019 expense ratios, the most recent data available, to demonstrate how much more expensive the Advisor class was than the Investor share class.

| Fund in Plan | 2019 Exp. Ratio | Lower Cost Share Class | 2019 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| PARJX T. Rowe Price Retirement 2025 Advisor | 0.89 % | TRRHX T. Rowe Price Retirement 2025 | 0.64 % | Target date | 39% |
| PARCX T. Rowe Price Retirement 2030 Advisor | 0.92 % | TRRCX T. Rowe Price Retirement 2030 | 0.67 % | Target date | 37% |

33

| Fund in Plan | 2019 Exp. Ratio | Lower Cost Share Class | 2019 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| PARBX<br>T. Rowe Price<br>Retirement 2020<br>Advisor | 0.86 % | TRRBX<br>T. Rowe Price<br>Retirement 2020 | 0.61 % | Target date | 41% |
| PARKX<br>T. Rowe Price<br>Retirement 2035<br>Advisor | 0.95 % | TRRJX<br>T. Rowe Price<br>Retirement 2035 | 0.70 % | Target date | 36% |
| PARDX<br>T. Rowe Price<br>Retirement 2040<br>Advisor | 0.97 % | TRRDX<br>T. Rowe Price<br>Retirement 2040 | 0.72 % | Target Date | 35% |
| PARHX<br>T. Rowe Price<br>Retirement 2015<br>Advisor | 0.82 % | TRRGX<br>T. Rowe Price<br>Retirement 2015 | 0.57 % | Target Date | 44% |
| PARLX<br>T. Rowe Price<br>Retirement 2045<br>Advisor | 0.97 % | TRRKX<br>T. Rowe Price<br>Retirement 2045 | 0.72 % | Target Date | 35% |
| PARFX<br>T. Rowe Price<br>Retirement 2050<br>Advisor | 0.97 % | TRRMX<br>T. Rowe Price<br>Retirement 2050 | 0.72 % | Target Date | 35% |
| PARAX<br>T. Rowe Price<br>Retirement 2010<br>Advisor | 0.79 % | TRRAX<br>T. Rowe Price<br>Retirement 2010 | 0.54 % | Target Date | 46% |
| PARGX<br>T. Rowe Price<br>Retirement 2005<br>Advisor | 0.79 % | TRRFX<br>T. Rowe Price<br>Retirement 2005 | 0.54 % | Target Date | 46% |

Case 3:19-cv-01158   Document 1   Filed 12/24/19   Page 34 of 54 PageID #: 34

| Fund in Plan | 2019 Exp. Ratio | Lower Cost Share Class | 2019 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| PAROX T. Rowe Price Retirement 2055 Advisor | 0.97 % | TRRNX T. Rowe Price Retirement 2055 | 0.72 % | Target Date | 35% |
| PEIYX Putnam Equity Income Y | 0.66 % | PEQSX Putnam Equity Income R6 | 0.55 % | Domestic Equity | 20% |
| HSIIX Carillon Eagle Small Cap Growth I | 0.75 % | HSRUX Carillon Eagle Small Cap Growth R6 | 0.65 % | Domestic Equity | 15% |
| SPVZX PGIM QMA Mid-Cap Value Z | 0.89 % | PMVQX PGIM QMA Mid-Cap Value R6 | 0.73 % | Domestic Equity | 22% |
| TGBAX Templeton Global Bond Adv | 0.69 % | FBNRX Templeton Global Bond R6 | 0.57 % | International Bond | 21% |

114.    The above is for illustrative purposes only.  At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

115.    T.Rowe Price did not offer I-shares, which were less expensive than their identical Investor share counterpart, until 2015.  From 2015 until now the Plan's fiduciaries could have offered the I-share version of the T.Rowe Price target date funds but failed to do so.  Additionally, beginning in 2017, T. Rowe Price lowered the minimum amount for investing in collective trusts

Case 3:19-cv-01158   Document 1   Filed 12/24/19   Page 35 of 54 PageID #: 35

to $20m.  Again, the Plan's fiduciaries failed to convert the mutual funds to the identical collective trust counterparts.

116.    The aforementioned allegations are depicted in the chart below using 2019 expense ratios, the most recent data available, to demonstrate how much more expensive the Plan's funds were than their I-share/collective trust counterparts.

| Fund in Plan | 2019 Exp. Ratio | Lower Cost Share Class/Collective Trust Analog[12] | 2019 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| PARCX<br>T. Rowe Price Retirement 2030 Advisor | 0.92% | T. Rowe Price Retirement 2030 I | 0.53% | Target date | 74 % |
| | | T. Rowe Price Retirement 2030 Tr-A | 0.46% | | 100 % |
| T. Rowe Price Retirement 2040 Advisor | 0.97% | T. Rowe Price Retirement 2040 I | 0.58% | Target date | 67 % |
| | | T. Rowe Price Retirement 2040 Tr-A | 0.46% | | 111 % |
| T. Rowe Price Retirement 2020 Advisor | 0.86% | T. Rowe Price Retirement 2020 I | 0.47% | Target date | 83 % |
| | | T. Rowe Price Retirement 2020 Tr-A | 0.46% | | 87 % |
| T. Rowe Price Retirement 2035 Advisor | 0.95% | T. Rowe Price Retirement 2035 I | 0.56% | Target date | 70 % |
| | | T. Rowe Price Retirement 2035 Tr-A | 0.46% | | 107 % |

---

[12] Where appropriate, each cell in this column references both a lower cost share class (identified first) and a collective trust version of the fund (identified second).  The listed expense figures are taken from the most recent summary prospectuses published in 2019.

36

| Fund in Plan | 2019 Exp. Ratio | Lower Cost Share Class/Collective Trust Analog[12] | 2019 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| T. Rowe Price Retirement 2050 Advisor | 0.97% | T. Rowe Price Retirement 2050 I | 0.59% | Target date | 64 % |
| | | T. Rowe Price Retirement 2050 Tr-A | 0.46% | | 111% |
| T. Rowe Price Retirement 2025 Advisor | 0.89% | T. Rowe Price Retirement 2025 I | 0.50% | Target date | 78 % |
| | | T. Rowe Price Retirement 2025 Tr-A | 0.46% | | 94 % |
| T. Rowe Price Retirement 2045 Advisor | 0.97% | T.Rowe Price Retirement I 2045 I | 0.59% | Target date | 64% |
| | | T.Rowe Price Retirement 2045 Tr-A | 0.46% | | 111% |
| T. Rowe Price Retirement 2015 Advisor | 0.82% | T.Rowe Price Retirement I 2015 I | 0.43% | Target date | 91% |
| | | T.Rowe Price Retirement 2015 Tr-A | 0.46% | | 78% |
| PARGX T. Rowe Price Retirement 2005 Advisor | 0.79% | TRPFX T. Rowe Price Retirement I 2005 I | 0.40% | Target date | 98% |
| | | T. Rowe Price Retirement 2005 Tr-A | 0.46% | | 72% |

| Fund in Plan | 2019 Exp. Ratio | Lower Cost Share Class/Collective Trust Analog[12] | 2019 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| T. Rowe Price Retirement 2010 Advisor | 0.79% | TRPAX<br><br>T. Rowe Price Retirement I 2010 I | 0.39% | Target date | 103% |
| | | T. Rowe Price Retirement 2010 Tr-A | 0.46% | | 72% |
| T. Rowe Price Target 2055 Advisor | 0.97% | TRPNX<br><br>T. Rowe Price Retirement I 2055 I | 0.59% | Target date | 64% |
| | | T. Rowe Price Retirement 2055 Tr-A | 0.46% | | 111% |

117.    The above is for illustrative purposes only.  At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes and/or collective trusts, and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

118.    As a large plan, the Plan had sufficient assets under management at all times during the Class Period to qualify for lower share classes which often have a million dollars as the minimum for a particular fund.  "Investment minimums for [collective trusts] are often $10 million, but will vary," *See* https://www.nb.com/en/us/insights/collective-investment-trusts-what-you-need-to-know, as demonstrated by T.Rowe Price's minimum of $20 million to qualify for a collective trust in a target date fund.

119.    At all times during the Class Period, each of the T.Rowe Price funds had assets under management that satisfied the minimum needed to qualify for I-share classes or collective

trusts (from 2017 to the present). For illustrative purposes, the following T.Rowe Price funds had assets under management of at least $20m as of the end of 2018:[13]

| Fund | Category | AUM |
| --- | --- | --- |
| T. Rowe Price Retirement 2020 Advisor | Target date | $48,812,901 |
| T. Rowe Price Retirement 2025 Advisor | Target date | $ 63,025,185 |
| T. Rowe Price Retirement 2030 Advisor | Target date | $ 62,801,370 |
| T. Rowe Price Retirement 2035 Advisor | Target date | $ 49,486,980 |
| T. Rowe Price Retirement 2040 Advisor | Target date | $ 40,294,168 |
| T. Rowe Price Retirement 2045 Advisor | Target date | $36,046,873 |
| T. Rowe Price Retirement 2050 Advisor | Target date | $22,012,476 |

120. A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into institutional shares at the earliest opportunity. Yet, despite the availability of lower-cost shares, Defendants did not transfer Plan holdings in any of these funds from retail shares into institutional shares, in breach of their fiduciary duties.

121. Additionally, Defendants breached their fiduciary duties by failing to consider collective investment trusts as alternatives to the mutual funds in the Plan. Defendants were or

---

[13] *See* 2018 Form 5500 at 41 of 42.

should have been aware at all times during the Class Period aware of the benefits of these alternative investment vehicles.

122. There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment. The Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

123. Similarly, Defendants cannot justify offering higher-cost mutual funds over collective trusts. The mutual fund versions of Plan investments offered no material service or other advantage to Plan participants over the collective trust versions. The Plan was obligated to provide the same fee, performance, and account information to participants for collective trusts as mutual funds. The only material difference was fees.

124. The Plan also incurred excess fees due to Defendants' failure to adequately investigate the availability of separate accounts in the same investment style of mutual funds in the Plan. Because of the Plan's size, it could have reaped considerable cost savings by using a separate account, but Defendants again failed to investigate this option.

125. Unlike mutual funds, which by law must charge the same fee to all investors, separate account fee schedules are subject to negotiation. Industry data shows that actual fee schedules on separate accounts are typically lower than advertised fee schedules, particularly when the plan or investor has a large amount of assets to invest, as did the Plan here.

126. In summary, Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to mutual funds, in order to negotiate the best possible price for the Plan. By failing to investigate the use of lower cost share classes, collective trust or separate

40

account alternatives to the mutual funds held by the Plan, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

127.   Defendants also failed to consider materially similar but cheaper alternatives to the Plan's investment options.  The chart below demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable passively-managed and actively-managed alternative funds in the same investment style.  A reasonable investigation would have revealed the existence of these lower-cost alternatives.  The chart below uses 2019 expense ratios, the most recent data available, as a methodology to demonstrate how much more expensive the Plan's funds were than their alternative fund counterparts.

| Fund in Plan | 2019 Exp. Ratio | Passive/Active Lower Cost Alternative[14] | 2019 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| T. Rowe Price Retirement 2030 Advisor | 0.92 % | FXIFX Fidelity Freedom® Index 2030 Investor | 0.12 % | Target date | 667 % |
| | | JPMorgan Smart Retirement Blend 2030 R6 | 0.29% | | 217% |
| T. Rowe Price Retirement 2025 Advisor | 0.89 % | FQIFX Fidelity Freedom® Index 2025 Investor | 0.12 % | Target date | 642 % |
| | | JPMorgan Smart Retirement Blend 2025 R6 | 0.29% | | 207% |
| T. Rowe Price Retirement 2020 Advisor | 0.86 % | FPIFX Fidelity Freedom® Index 2020 Investor | 0.12 % | Target date | 617 % |

---

[14]  Where appropriate, each cell in this column references both a passively-managed fund (identified first) and an actively-managed fund (identified second).  The listed expense figures are taken from the most recent summary prospectuses published in 2019.

41

| Fund in Plan | 2019 Exp. Ratio | Passive/Active Lower Cost Alternative[14] | 2019 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| | | JPMorgan Smart Retirement Blend 2020 R6 | 0.29% | | 197% |
| T. Rowe Price Retirement 2035 Advisor | 0.95 % | FIHFX Fidelity Freedom® Index 2035 Investor | 0.12 % | Target date | 692 % |
| | | JPMorgan Smart Retirement Blend 2035 R6 | 0.29% | | 228% |
| T. Rowe Price Retirement 2040 Advisor | 0.97 % | FBIFX Fidelity Freedom® Index 2040 Investor | 0.12 % | Target date | 708 % |
| | | JPMorgan Smart Retirement Blend 2040 R6 | 0.29% | | 234% |
| Putnam Equity Income R6 | 0.55 % | VDADX Vanguard Dividend Appreciation Index Adm | 0.08 % | Domestic Equity | 588% |
| | | Vanguard Equity-Income Adm | 0.18% | | 206% |
| T. Rowe Price Retirement 2045 Advisor | 0.97 % | FIOFX Fidelity Freedom® Index 2045 Investor | 0.12 % | Target Date | 708 % |
| | | JPMorgan Smart Retirement Blend 2045 R6 | 0.29% | | 234% |
| T. Rowe Price New America Growth I | 0.66 % | VIGIX Vanguard Growth Index Institutional | 0.04 % | Domestic Equity | 1550% |
| | | Vanguard PRIMECAP Adm | 0.31% | | 113% |

Case 3:19-cv-01158   Document 1   Filed 12/24/19   Page 42 of 54 PageID #: 42

| Fund in Plan | 2019 Exp. Ratio | Passive/Active Lower Cost Alternative[14] | 2019 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| American Funds Europacific Growth R6 | 0.49 % | Vanguard Total Intl Stock Index I | 0.08% | Int'l Equity | 53 % |
| | | VWILX Vanguard International Growth Adm | 0.32 % | | 53% |
| T. Rowe Price Retirement 2050 Advisor | 0.97 % | FIPFX Fidelity Freedom® Index 2050 Investor | 0.12 % | Target Date | 708 % |
| | | JPMorgan Smart Retirement Blend 2050 R6 | 0.29% | | 234% |
| T. Rowe Price Retirement 2015 Advisor | 0.82 % | FLIFX Fidelity Freedom® Index 2015 Investor | 0.12 % | Target Date | 583 % |
| | | JPMorgan Smart Retirement Blend 2015 R6 | 0.29% | | 183% |
| Hartford MidCap HLS IA | 0.69 % | VMGMX Vanguard Mid-Cap Growth Index Admiral | 0.07 % | Domestic Equity | 886 % |
| | | Vanguard Mid-cap Growth | 0.36% | | 92% |
| T. Rowe Price Target 2055 Advisor | 0.97 % | FDEWX Fidelity Freedom® Index 2055 Investor | 0.12 % | Target Date | 708% |
| | | JPMorgan Smart Retirement Blend 2055 R6 | 0.29% | | 234% |
| Nuveen Small Cap Value R6 | 0.78 % | VSIIX Vanguard Small Cap Value Index I | 0.06 % | Domestic Equity | 1200 % |

| Fund in Plan | 2019 Exp. Ratio | Passive/Active Lower Cost Alternative[14] | 2019 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| | | Vanguard Explorer Value | 0.56% | | 39% |
| Carillon Eagle Small Cap Growth R6 | 0.65 % | VSGAX Vanguard Small Cap Growth Index Admiral | 0.07 % | Domestic Equity | 829 % |
| | | Vanguard Explorer | 0.46% | | 41% |
| PGIM QMA Mid-Cap Value Z | 0.89 % | VIMAX Vanguard Mid Cap Index Admiral | 0.05 % | Domestic Equity | 1680 % |
| | | Vanguard Selected Value | 0.36% | | 147% |
| T. Rowe Price Retirement 2005 Advisor | 0.79 % | FJIFX Fidelity Freedom® Index 2005 Investor | 0.12 % | Target Date | 558% |
| | | JPMorgan Smart Retirement Blend 2005 R6 | 0.29% | | 172% |
| T. Rowe Price Retirement 2010 Advisor | 0.79 % | FKIFX Fidelity Freedom® Index 2010 Investor | 0.12 % | Target Date | 558 % |
| | | JPMorgan Smart Retirement Blend 2010 R6 | 0.29% | | 172% |
| Templeton Global Bond R6 | 0.57 % | VTIFX Vanguard Total Int'l Bond Idx I | 0.07% | Int'l Bond | 714 % |
| | | Federated International Bond Strategy | 0.03% | | 1800% |
| | 1.30 % | NA | NA | Other | |

Case 3:19-cv-01158   Document 1   Filed 12/24/19   Page 44 of 54 PageID #: 44

| Fund in Plan | 2019 Exp. Ratio | Passive/Active Lower Cost Alternative[14] | 2019 Exp. Ratio | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| JHancock Alternative Asset Allc R6 | | Putnam Multi-Asset Absolute Return R6 | 0.66% | | 97% |
| Artisan Mid Cap Institutional | 0.96 % | VIMAX Vanguard Mid Cap Index Admiral | 0.05% | Domestic Equity | 1820 % |
| | | Vanguard Mid-Cap Growth Fund | 0.36% | | 167% |

128.    The above is for illustrative purposes only as the significant fee disparities detailed above existed for all years of the Class Period. The Plan expense ratios were multiples of what they should have been given the bargaining power available to the Plan fiduciaries.

129.    Moreover, the Plan's fiduciaries cannot justify selecting actively managed funds over passively managed ones.  As noted above, while higher-cost mutual funds may outperform a less-expensive option such as a passively-managed index fund over the short term, they rarely do so over a longer term. With regard to this action in particular, there is objective evidence that selection of actively managed funds over passively managed ones with materially similar characteristics was unjustified.  Comparing the five-year returns of some of the Plan's actively managed funds with those of comparable index (passively managed) funds with lower fees demonstrates that accounting for fees paid, the actively managed funds lagged behind in performance. The chart below indicates the efficiency of the active funds or lack thereof (*i.e.*, the return needed by the actively managed fund to match the returns of the passively managed fund):

| Fund Name/ Comparator | Expense Ratio | Return (5 Year) | Return Deficiency |
|---|---|---|---|
| T. Rowe Price Retirement 2030 Fund | 0.66 | 7.27 | Needs .27% more return to be efficient |

45

| | | | |
|---|---|---|---|
| Vanguard Target Retirement 2030 Inv | 0.14 | 6.9 | |
| T. Rowe Price Retirement 2025 Fund | 0.63 | 6.82 | Needs .35% more return to be efficient |
| Vanguard Target Retirement 2025 Inv | 0.13 | 6.56 | |
| T. Rowe Price Retirement 2020 Fund | 0.59 | 6.32 | Needs .33% more return to be efficient |
| Vanguard Target Retirement 2020 Inv | 0.13 | 6.08 | |
| T. Rowe Price Retirement 2035 Fund | 0.68 | 7.59 | Needs .26% more return to be efficient |
| Vanguard Target Retirement 2035 Inv | 0.14 | 7.22 | |
| T. Rowe Price Retirement 2040 Fund | 0.70 | 7.84 | Needs .28% more return to be efficient |
| Vanguard Target Retirement 2040 Inv | 0.14 | 7.52 | |
| T. Rowe Price Retirement 2045 Fund | 0.71 | 7.96 | Needs .25% more return to be efficient |
| Vanguard Target Retirement 2045 Inv | 0.15 | 7.67 | |
| American Funds EuroPacific Growth R6 | 0.49 | 7.63 | Needs 2.33% more return to be efficient |
| Vanguard International Growth Inv | 0.45 | 10.79 | |

130.    Defendants' failure to investigate lower cost alternative investments (both actively and passively managed funds) during the Class Period cost the Plan and its participants millions of dollars.

**B.    Defendants Failed to Monitor or Control the Plan's Recordkeeping Expenses**

131.    Recordkeeping is a necessary service for any defined contribution plan. The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

132.    The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven

46

by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

133.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

134.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs.  First, they must pay close attention to the recordkeeping fees being paid by the plan.  A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

135.     Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

136.     Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that

Case 3:19-cv-01158   Document 1   Filed 12/24/19   Page 47 of 54 PageID #: 47

are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.

137. Defendants have wholly failed to prudently manage and control the Plan's recordkeeping costs. Given the increase in size of the Plan's assets during the Class Period and total number of unique participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services that would have been provided by its recordkeeper, Mercer, to the Plan. Based on Plaintiffs' investigation and analysis, a normal range of recordkeeping fees for a plan with approximately 28,000 participants with account balances roughly the size of the Plan, would have been less than $50 per participant from 2010 to 2012, and lower in ensuing years. *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786 (7th Cir. 2011) (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

138. The recordkeeping fees paid by the Plan to Mercer greatly exceeded this reasonable range. In 2013, the Plan paid $97.35 per participant. For 2014 through 2016, the Plan paid $94.28,

$103.45, and $70.30 respectively per participant.  In 2017, the Plan paid between $139 and $202 per participant, and in 2018 the Plan paid $117 per participant.

139.    A prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plan millions of dollars per year and constituted separate and independent breaches of the duties of loyalty and prudence.

## FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duties of Loyalty and Prudence
### (Asserted against the Ardent and Committee Defendants)

140.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

141.    At all relevant times, the Company and Committee Defendants ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

142.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

143.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint.  They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of

49

Plan participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. In addition, the Prudence Defendants failed to investigate separate accounts and/or collective trusts as alternatives to mutual funds, even though they generally provide the same investment management services at a lower cost. Likewise, the Prudence Defendants failed to monitor or control the grossly-excessive compensation paid for recordkeeping services.

144. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

145. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

146. The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against Ardent and the Board Defendants)

147.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

148.    Ardent and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

149.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

150.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Ardent and the Board Defendants.

151.    Ardent and the Board Defendants breached their fiduciary monitoring duties by, among other things:

(a)     Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

51

(b)     failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost separate account and collective trust vehicles; and

(c)     failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

152.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had Ardent and the Board Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

153.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Ardent and the Board Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## JURY DEMAND

154.    Plaintiffs demand a jury.

## PRAYER FOR RELIEF

136.    WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

52

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E. An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Employer Defendants as necessary to effectuate said relief, and to prevent the Employer Defendants' unjust enrichment;

F. Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G. An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or

53

fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary

duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund

doctrine; and

L.      Such other and further relief as the Court deems equitable and just.


Dated:  December 24, 2019                    Respectfully submitted,


                                             **LAW OFFICE OF NICHOLAS DANIEL WAITE**

                                             /s/ Nicholas D. Waite_____.
                                             Nicholas Daniel Waite, Esquire
                                             TN Atty. I.D. No. 027766
                                             219 2nd Avenue N., Suite 400
                                             Nashville, TN  37201-1616
                                             (855) 566-3948

                                             Local Co-Counsel for Plaintiffs Pursuant to Local
                                             Rule 83.01(d).


                                             **CAPOZZI ADLER, P.C.**

                                             /s/ Mark K. Gyandoh_____.
                                             Mark K. Gyandoh, Esquire (*Pro Hac Vice*
                                             application pending)
                                             PA Atty. I.D. No. 88587
                                             2933 North Front Street
                                             Harrisburg, PA 17110
                                             (717) 233-4101
                                             Fax (717) 233-4103

                                             Counsel for Plaintiffs and the Putative Class.